```
JAN
F.#2002R01303
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-                   02 CR 589 (S-2) (RJD)

JEFFREY A. ROYER,

             Defendant.

- - - - - - - - - - - - - - - X

## GOVERNMENT'S SENTENCING MEMORANDUM

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
Eastern District of New York
One Pierrepont Plaza
Brooklyn, New York 11201

JOHN A. NATHANSON
Assistant United States Attorney
(Of Counsel)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-                     02 CR 589 (S-1) (RJD)

JEFFREY A. ROYER,

          Defendant.

- - - - - - - - - - - - - - - - - X

## PRELIMINARY STATEMENT

      This defendant was an FBI Special Agent from November 1996 until December 2001, sworn to uphold the law.  For a period encompassing almost the last two years of his employment, he routinely breached his sworn oath by providing confidential law enforcement information to co-conspirators, including Amr I. Elgindy, whom he knew would use that information to trade securities and manipulate their prices.  The defendant was willing to betray his oath because he wanted the money he understood his co-conspirators could offer him.

      Before he left the FBI to work for Elgindy in December 2001, the defendant provided to these same co-conspirators stolen information concerning an investigation about 9/11, a betrayal perhaps even more shocking than those he had previously committed.  He compounded his conduct by coopting a colleague and girlfriend, Lynn Wingate, to continue to provide confidential law enforcement after the defendant began working for Elgindy.  He

2

also procured confidential information from another colleague, Michael Mitchell, who believed, based on the defendant's false representations, that the defendant was working in an official government capacity.  Following his arrest, the defendant tampered with Mitchell, relating to Mitchell the false statements the defendant had made to his arresting officers in the hope that Mitchell would repeat them.

Finally, when the defendant testified during trial, he lied, denying that he had any idea that the information he provided Elgindy and others was being used to trade securities. Indeed, the defendant refused to accept that he had "provided" any information at all, a rationalization that he believed allowed him to lie to FBI agents who asked him before he left the FBI in December 2001 whether he had provided confidential information to Elgindy.  Instead, he claimed he had "shared" it with the sole aim of obtaining in exchange useful information for investigations in which he had no role.

The defendant, as he concedes himself, has engaged in egregious misconduct.  The government believes that this Court should therefore impose a very significant sentence consistent with the nature and extent of this defendant's crimes.

I.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

A.   Introduction to The Securities Fraud Conspiracy

Derrick Cleveland met the defendant - an FBI agent then working in Oklahoma City - in early 2000 when the defendant

3

appeared at Cleveland's office. (Tr. 172).[1]  Shortly after that initial encounter, the defendant appeared again and Cleveland showed him Amr I. Elgindy's AnthonyPacific website (the "AP site"), (Tr. 174), whose primary purpose was to recommend shorting certain stocks. (Tr. 191).

Shortly thereafter, the defendant provided confidential law enforcement information to Cleveland regarding Broadband Wireless ("BBAN"). (Tr. 214; GX-JL-1).  Cleveland immediately conveyed the information to Elgindy, who traded on it. (GX-2582).  Cleveland told Elgindy that he learned the information from an FBI agent, a fact which Elgindy was quick to verify. (Tr. 219).  Elgindy, satisfied as to the source of the information, urged Cleveland to get more specific confidential law enforcement information from the defendant. (Tr. 221).

Shortly after the defendant provided Cleveland and Elgindy stolen information on BBAN, the defendant provided Cleveland additional misappropriated information about other companies. (Tr. 226).  Cleveland suggested to the defendant that they could make a lot of money trading in these and other companies' stocks based on the purloined information, and that they could give the information to Elgindy so that, through Elgindy's website, they could "crush" the stocks. (Tr. 228).

From June 2000 through September 2000, while Elgindy

---

[1]  Transcript references are to the electronic transcript, which varies at certain points from the hard-copy transcript.

4

was in jail, the defendant continued to provide confidential law enforcement information to Cleveland.  Once Elgindy was released from jail in early October 2000, Cleveland started feeding Elgindy confidential law enforcement information, initially on Seaview Underwater Research, Inc. ("SEVU"), obtained from the defendant.  (Tr. 266-67).

After the SEVU insider trading, the defendant continued to provide confidential law enforcement information to Cleveland and Elgindy.  In late 2000, Elgindy asked to speak, and did speak, with the defendant directly.  (Tr. 323).  From that point forward, while most information still flowed through Cleveland, Elgindy and the defendant also communicated directly with one another.  (Tr. 324).

The defendant, whom Elgindy called his "personal FBI agent," appeared on the AP site so that the defendant could verify to AP site members that the information they received did indeed originate with the FBI.  (Tr. 441; 450).  In addition to placing the defendant's confidential law enforcement information on the AP site and encouraging AP site members to trade on the information, Elgindy and the defendant actively worked to pry information from SEC personnel.  (Tr. 329).

In all, the defendant provided Cleveland and Elgindy, and, by extension, numerous AP site members and others, confidential law enforcement information with respect to more than fifty companies.  (Tr. 489).  With respect to FBI computer

searches alone, between March 30, 2000 (BBAN) and March 4, 2002
(IMCL), the defendant and Lynn Wingate misappropriated and passed
confidential law enforcement information on dozens of companies
and individuals.[2]

B.    Tony Elgindy's Personal FBI Agent

While Elgindy's AP site may originally have had some
legitimate purpose, Elgindy stated in chat that the defendant's
FBI information was "what the site is all about.  Fidelity and
bravery and insider selling."  (Tr. 584).  The AP site's shift
was made possible by the defendant's continued willingness to
provide confidential law enforcement information to Elgindy.
Both the defendant and Elgindy actively cultivated this mutual
relationship.  In February 2001, Elgindy invited the defendant
and Cleveland to Elgindy's house in San Diego.  (Tr. 552).  While

_____

[2]    The defendant passed confidential law enforcement
information to Cleveland, Elgindy and others concerning the
following stocks: Seaview ("SEVU"); Freedom Surf ("FRSH") (Tr.
495); SoftQuad ("SXML") (Tr. 508); BioPulse ("BIOP") (Tr. 529);
GenesisIntermedia ("GENI") (Tr. 538, 3874); Optimum Source
("OSIN") (Tr. 579); Polymedica ("PLMD") (Tr. 595); Hercules
("HDBG"); Junum ("JUNM") (Tr. 629, 3859); Global Asset Holdings
("GAHI") (Tr. 637); Flor Decor ("FLOR") (Tr. 735); Trident
("TDNT") (Tr. 762); TTR Technologies ("TTRE") (Tr. 3870); Real
Time Cars ("RTCI") (Tr. 783, 3863); Hypermedia ("NMNW") (Tr.
788); Vital Living ("VLPI") (Tr. 814); Eagle Building ("EGBT")
(Tr. 3873); Nuclear Solutions ("NSOL"); BGI Industries ("BGII")
(Tr. 906, 2542); Medi-Hut ("MHUT"); and ("IVSO") (Tr. 917);
("BYTE") (Tr. 516); Jaguar ("JGUR") (Tr. 646); Sulphco ("SLPH").
(Tr. 656-58, 672); and Broadband Wireless ("BBAN").  By reviewing
FBI records, Special Agent Jack Liao was able to confirm that the
defendant misappropriated confidential law enforcement
information for at least 37 stocks, including all of the stocks
mentioned in this footnote.  (GX-JL-1).

there, the defendant told Elgindy how FBI investigations worked
(Tr. 560); Elgindy told the defendant how much money he had made
from certain information provided by the defendant (Tr. 561);
Elgindy offered employment to the defendant, and the defendant
accepted (Tr. 568-69); and the defendant asked whether Elgindy
could loan him money.  (Tr. 569).  On May 23, 2001, Elgindy told
the AP site that Elgindy was hiring a "current FBI agent" to act
as an investigator.  (Tr. 621; GX-3311 Elgindy stated, "I'm
hiring another FBI Agent . . . he'll have to leave the FBI at the
time. . . . . I've put a very lucrative deal in front of him").
On June 27, 2000, the defendant, e-mailing Elgindy about the
defendant's prospective job, wrote, "i want to make a million
dollars a year . . . if you want to make 20 million, then i will
make 2." (GX-2222).

          In fact, it's clear that the defendant essentially
worked for the defendant well before he left the FBI at the end
of December 2001.  For example, on July 12, 2001, the defendant
stated in an e-mail to Elgindy, "Laughed my ass off at GAHI
today.  What a shit company.  Take care of Derrick on this one.
He got some good info in my opinion.  Solomon Grey could
potentially keep us in business for a long time.  Meanwhile, we
can drive them crazy by driving their dick in the dirt on all
their turd deals." (GX-2093).

          In the Summer of 2001, Elgindy organized a trip to Las
Vegas with various AP site members and the defendant joined them

and stayed with Elgindy in his hotel room.  (Tr. 616).  Among
other things, during the trip the defendant provided Elgindy with
confidential law enforcement information concerning JUNM and
further discussed with Elgindy the defendant's employment.  (Tr.
617, 620).  As part of the Las Vegas festivities, Elgindy and
several AP site members were photographed with the defendant's
business card plastered to their foreheads.  (Tr. 617).  Also
during the Summer of 2001, and later, Elgindy and Cleveland
discussed the defendant's ability to continue obtaining
confidential law enforcement information after he left the FBI
through the defendant's girlfriend, Lynn Wingate, and another law
enforcement officer.[3]  (Tr. 800, 803).

        The defendant was so deeply involved in his
relationship with Elgindy that the defendant wrote a letter to
Elgindy's probation officer, recommending early probation-
termination.  (Tr. 812).  In that letter, the defendant falsely
claimed he was still an FBI agent.  (Tr. 812).  As is clear from
discussions about this letter, the defendant allowed Elgindy to

_____

        [3]    After the defendant left the FBI to begin working with
Elgindy in December 2001, the defendant asked Wingate to access
confidential law enforcement information and provide it to him.
On March 4, 2002, Wingate ran a computer search on the name "Sam
Waksal," Imclone's chief executive.  Wingate then told the
defendant that there was an active investigation into Imclone and
that Cathy Farmer, an FBI agent, was assigned to the case.  On
the following day, Elgindy wrote on the AP site that "I cannot
say what on IMCL [Imclone] is, just that I would never be long at
this point."  On April 23, 2002, Wingate ran searches on Webtel
and her own name.

8

use the defendant's position as an FBI agent in any way that
would curry Elgindy's favor.  Thus, on August 14, 2001, after
Elgindy told the defendant that Elgindy would "need a letter
saying how valuable I am to the U.S. government . . . ."  (GX-
2104), the defendant replied,

> Can I start with something like Tony is so
> cool he shits ice cubes or Tony is as
> valuable to the U.S. Government as two-ply is
> to toilet paper.  Both of these statements
> are true to the best of my knowledge.  I know
> I have to write a recommendation for you, but
> when, where and how.  It would be great if I
> didn't have to due to some flunky finding out
> about it later and holding it against us, but
> whatever works, I know you don't want me to
> leave the bureau before it is written, all I
> want to know is if that will be in October,
> April or next October.  (GX-2104).

Finally, in January 2002, in what was a culmination of
months of planning, the defendant, together with Cleveland,
officially started working in Elgindy's office in San Diego.
(Tr. 837).

C.   <u>The Defendant's Obstruction of Justice</u>

  1.   <u>Obstruction of Ongoing Investigations</u>

The defendant understood that he was routinely
committing crimes with Elgindy, Cleveland and others.  He
therefore had a strong incentive to use the means available to
him to determine whether his co-conspirators were under FBI
investigation.  On several occasions prior to September 2001, the
defendant, following inquiries by Cleveland and Elgindy, searched
the FBI's computer databases for any such investigations, and

passed the negative results on to Elgindy.  (Tr. 483-84, 775).

In September 2001, the defendant told Cleveland that Elgindy was under investigation for a serious matter independent of securities fraud.  (Tr. 805).  The defendant and Cleveland spoke about the matter many times, both before and after the defendant left the FBI in December 2001, during which conversations the defendant mentioned details of the investigation.[4]  (Tr. 806, 946).  Based on Elgindy's preparations to flee the United States, lies he told his probation officer and statements he made to law enforcement officers, it is clear that at least some of the information passed from the defendant to Cleveland reached Elgindy.

It was at this point that the defendant agreed to write a letter to the District Court Judge in the Northern District of Texas recommending Elgindy for early supervised release termination.  (Tr. 3487; GX-3738).  In the undated letter, submitted to the court on January 11, 2002, the defendant claimed to write in his "capacity as a Special Agent with the Federal Bureau of Investigation," despite the fact that he had left the FBI the prior December and was employed by the defendant, a fact conveniently omitted.[5]

---

[4]     The defendant also told Michael Mitchell, a Gallup, New Mexico police officer, that Elgindy was being investigated in connection with terrorism.  (Tr. 3129).

[5]     That the defendant passed on information about the investigation to Elgindy is supported by an e-mail the defendant

On April 18, 2002, at the defendant's request, Wingate ran the defendant's and Elgindy's names in the FBI computer database.  As confirmed by notes seized from Wingate at the time of her arrest, she then passed various pieces of information gleaned from that search to the defendant, most notably names associated with the FBI's investigation into Elgindy, an investigation that - at the time - had both securities and terrorism components.  Based on the information Wingate gathered at the defendant's behest, the defendant and Cleveland took steps to distance themselves from Elgindy.

     2.  <u>Perjury</u>

Fully exercising his right to testify, the defendant spent several days on the stand during trial.  The essence of the defendant's testimony was that he "shared" confidential law enforcement information with Elgindy,[6] Cleveland and others,

---

wrote to Elgindy on February 7, 2002, in which the defendant stated "[w]e definitely need some breathing room . . . I need to get a feel for what the bureau is doing in regard to this whole ordeal.  We are so close, no need to screw things up."  (GX-2499).  In that same e-mail, the defendant told Elgindy, "Get some good facetime with Derrick as he has lots on his mind."  (GX-2499).  As Cleveland testified, what was primarily on his mind in February 2002 was the FBI's investigation into Elgindy.

[6]    In an obvious effort to conceal this "sharing" activity, the defendant told FBI Special Agent Raymond Gonzalez prior to the defendant's departure from the FBI that he never gave confidential information to Elgindy.  (Tr. 6879).  The defendant considered this answer truthful because, despite having no authorization to do so, he "shared" with Elgindy and others information for what he claimed was a legitimate law enforcement purpose.  (Tr. 6873).

despite having no authorization to do so, solely in an effort to generate investigative information in return.[7]  When asked on cross-examination about the possibility that anyone might make money by trading on that information, the defendant testified that "I'm telling you the information I provided to get information was not given to trade on nor did I have any idea who was trading, when they were trading or why they were trading."[8] (Tr. 6868).  The defendant made that statement, and many similar statements, despite acknowledging that he knew at the time that Elgindy and Cleveland were short-sellers, that Elgindy ran a short-selling website, and that the confidential information

_____

[7]     Among other pieces of information, the defendant provided Cleveland information about the FBI's 9/11 trading investigation.  (Tr. 6894).  As with the confidential information regarding other investigations, the defendant testified incredibly that he provided this extremely sensitive information about an investigation in which he had no involvement in order to obtain information from Cleveland about Elgindy.  (Tr. 6895-96).

[8]     Although this perjured testimony could serve as the basis for an enhancement for obstruction of justice, see Guidelines Manual (2001), §3C1.1, the Amended Presentence Investigation Report, dated July 25, 2006 ("Amended PSR"), has already applied such an enhancement based on the defendant's provision of stolen information regarding an ongoing investigation.  See Amended PSR, ¶ 113.  Such an enhancement for perjury is warranted where a defendant "1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  See United States v. Ben-Shimon, 249 F.3d 98, 102 (2nd Cir. 2001) (quoting United States v. Zagari, 111 F.3d 307, 329 (2nd Cir. 1997)).  This statement was made for "the purpose of obstructing justice" and was "material to the proceeding in which it [was] given."  See Id.  While a guidelines enhancement may be unavailable for this conduct, it should be taken into account in sentencing this defendant.  See infra, Section II(C).

provided by the defendant appeared on that site.  (Tr. 6866).
Indeed, the defendant himself, at least on occasion, visited the
site in order to verify the source of the stolen information.
Additionally, the defendant gave Cleveland money to trade on the
defendant's behalf, while at the same time providing Cleveland
confidential law enforcement information that Cleveland could and
did use in his trading activity.

      Consistent with the jury's verdict, it was clear from
the evidence presented at trial that the defendant testified
falsely about his knowledge of the use to which the information
he stole was put and was intended to be put.

D.    The Defendant's Witness Tampering

      After leaving the FBI, the defendant obtained
confidential law enforcement information from Michael Mitchell, a
Gallup, New Mexico police officer, under the false pretense of
continuing to perform official duties.  (Tr. 3132).
Specifically, the defendant, on various occasions over the course
of months, asked Mitchell to run a number of names and license
plate numbers through confidential law enforcement databases and
to provide the results to the defendant. (Tr. 3134-3140).  In
fact, despite the defendant's implications that the defendant
required this information for official government purposes, the
defendant wanted the information in furtherance of the
defendant's employment with Elgindy.

      Following his arrest, the defendant told Mitchell that

13

he had falsely told the arresting agents that he had asked
Mitchell to perform only one search.  (Tr. 3146).  In the context
of discussing the possibility that FBI agents might interview
Mitchell, the defendant reiterated to Mitchell several times that
the defendant had told the FBI that he had requested only one
search.  (Tr. 3147).  Mitchell understood that the defendant was
asking Mitchell to "outright lie to the FBI" about the matter.
(Tr. 3148).

## II.  THE SENTENCING GUIDELINES

A defendant's sentence under the United States
Sentencing Guidelines (the "Guidelines") is to be determined
based on "relevant conduct."  "Relevant conduct," as defined in
Section 1B1.3 of the Guidelines, means:

> all acts and omissions committed, aided, abetted,
> counseled, commanded, induced, procured, or willfully
> caused by the defendant; and
>
> in the case of a jointly undertaken criminal activity
> (a plan, scheme, endeavor, or other enterprise
> undertaken by the defendant in concert with others,
> whether or not charged as a conspiracy), all reasonably
> foreseeable acts and omissions of others in furtherance
> of the jointly undertaken criminal activity.

The defendant here stands convicted of being a member
of a racketeering conspiracy and of a securities fraud conspiracy
spanning the period March 2000 through April 2002.  As detailed
above, that conspiracy involved the defendant's procurement and
unlawful dissemination of an enormous volume of misappropriated,
confidential law enforcement information.  While the defendant

14

may not have been aware of all the uses to which the information
was put, it is fundamental to both the "relevant conduct"
standard cited above and the law of conspiracy that a conspirator
may be held responsible for the acts of his co-conspirators,
whether or not he was aware of, or caused, each of those acts.
Any claim that the defendant did not foresee that others would
trade on or disseminate misappropriated information is unfounded.
The defendant clearly understood that the information he provided
was being used by Elgindy, Cleveland and others for their own
profit.  Indeed, the defendant appeared on the AP site to tout
the information he provided.  Whether or not the defendant
himself actually saw a significant profit from the purloined
information, he wholly understood the manner in which this
information - information which he was solely responsible for
obtaining - was being used.

       This Court has already determined, in the course of a
lengthy and rigorously-briefed sentencing proceeding involving
Elgindy, that the relevant "loss" figure in this case is
$1,568,008.93.  See Amended PSR, ¶ 108.  That represents the gain
that the various co-conspirators realized in trading on the
information provided by the defendant.  As the government has
repeatedly argued, that figure is generous, in that it includes
only the trades of a limited number of people for a highly-
circumscribed period after they came into possession of the
defendant's misappropriated information.  Clearly, many others

15

whose trading gains are excluded from that figure realized insider trading gains using that same information.  Moreover, the Court did not include in its calculation of the enterprise's gains site fees generated by the AP site, despite the fact that subscribers were paying largely for access to the misappropriated information.

That the defendant himself did not directly profit from trading on the misappropriated information is irrelevant to determining a loss amount in this case.  As the defendant himself recognizes, (Def. Sentencing Ltr., p.2), a co-conspirator may be held responsible for the conduct of his colleagues, and that is no more appropriate than in this case where there would have been no illegal trading profits whatsoever had not the defendant decided to breach his duty to the FBI.

Further, while the defendant may not have seen a profit directly from the unlawful trading, he saw what he conceived of as an immense benefit in the employment he procured with Elgindy. The defendant believed that this employment promised far more than a middle-class income.  Whether that belief was reasonable or not, given the character of the defendant's prospective employer, it certainly accounts for the defendant's conduct.

While the defendant suggests that his conduct was motivated by an undefined something other than greed, (Def. Sentencing Ltr., p. 5), the record is replete with references to the defendant's desire for money.  In addition to Elgindy's

16

promised employment, the defendant gave Cleveland $15,000, a considerable sum to the insolvent defendant, to trade on the defendant's behalf. (Tr. 6974-87). Although the defendant denied it during his trial testimony, he obviously understood that Cleveland was going to use those funds to try and generate a profit based, at least in part, on the misappropriated information the defendant provided. While Cleveland may not have succeeded in earning a profit for the defendant, that says nothing about the defendant's motivation in providing Cleveland money and information on which to trade. That this was the defendant's motivating principle was also demonstrated by his willingness to sell confidential information unlawfully taken from the FBI to the Dateline television show for $600,000. (Tr. 965).

A.   <u>Guidelines Calculation for Securities Fraud Charges</u>

Consistent with this Court's prior rulings and the Amended PSR, the government submits that Racketeering Acts 1 through 7 and Counts 2 through 6 should be considered together. (PSR, ¶ 104). <u>See</u> Guidelines Manual (2001), § 3D1.2(d). As noted above, the "relevant conduct" associated with these charges for sentencing purposes includes acts counseled, aided or caused by the defendant, and all reasonably foreseeable acts in furtherance of jointly undertaken activity. The Guidelines Manual states that the "court must first determine the scope of the criminal activity the particular defendant agreed to jointly

17

undertake." See Guidelines Manual (2001), 1B1.3, Application Note 2.  Here, the defendant was convicted of being a member of the Elgindy Enterprise, whose members, from March 2000 through May 2002, conspired to profit from insider trading, manipulation and extortion.  While Elgindy may have been the enterprise's leader, the defendant provided the information that fueled the enterprise and made it possible.

Based on these facts, the government agrees with the guidelines calculation associated with the securities conspiracy provided in the Amended PSR, see PSR ¶¶ 107 - 114, which yield an offense level of 28.

B.   Guidelines Calculation for Extortion Counts

The defendant argues that the Amended PSR mistakenly calculates a guidelines range for extortion, despite the fact that the defendant was not specifically convicted of that crime. The defendant, however, was convicted of a racketeering conspiracy, one means of which was extortion.  The sentencing guidelines provide that, in cases involving racketeering, the relevant base offense levels are those "applicable to the underlying racketeering activity." See Guidelines Manual (2001) §2E1.1(a)(2).  The particular racketeering acts need not be found beyond a reasonable doubt, however.  See United States v. Ruggiero, 100 F.3d 284, 289-91 (2nd Cir. 1996) (in RICO case, finding racketeering acts by preponderance of the evidence and applying separate guidelines calculations to those acts).  See

18

also United States v. Hurley, 374 F.3d 38, 39 (1st Cir. 2004)
(citing United States v. Carrozza, 4 F.3d 70, 74-83 (1st Cir.
1993)) (reference in §2E1.1(a)(2) to "underlying racketeering
activity" "could properly encompass relevant conduct for which a
defendant has not been convicted").  Instead, if those acts
constitute "relevant conduct," proved by a preponderance of the
evidence, they may be included for guidelines calculation
purposes.  See Ruggiero, 100 F.3d at 290-91.

While the defendant was not convicted of extortion
conspiracy or extortionate acts, his co-conspirators used the
misappropriated information supplied by the defendant in making
their extortionate demands with respect to both Nuclear Solution
and Flor Decor.[9]  In particular, Elgindy posted misappropriated
information on his AP site, then threatened further dissemination
unless his extortionate demands were met.  Given the use to which
the defendant knew his information was put in furtherance of his
co-conspirators trading schemes, this particular use was
certainly reasonably foreseeable to the defendant.  See
Guidelines Manual (2001), §1B1.3.  Thus, the defendant should be
held responsible for his co-conspirators' extortionate conduct
regardless of the extent of his own direct participation.

---

[9]     For a detailed review of the evidence regarding the
Nuclear Solutions and Flor Decor extortions, the government
respectfully refers the Court to the Government's Sentencing
Memorandum, pp. 20-23 and 65-59, submitted in connection with
this Court's sentencing of Amr I. Elgindy.

Therefore, as detailed in the Amended PSR, ¶¶ 115-128, 144, 146 and 148, the defendant should be subjected to an additional offense level for the extortion conduct, leaving him at offense level 29.

C.   Departures

   1.   Disruption of Governmental Function[10]

The above guidelines calculation results in a significant sentence, yet it takes little account of the very essence of the defendant's crime.  The defendant used his privileged position as an FBI agent to access confidential law enforcement information on hundreds of occasions for personal gain.  Certain of the investigations the defendant compromised involved undercover agents and cooperating witnesses.  When the defendant left the FBI to work with Elgindy - lured by the prospect of millions of dollars - the defendant shamefully coopted his girlfriend, Lynn Wingate, to continue supplying misappropriated information.

The defendant allowed various individuals, including Elgindy, to have their photographs taken in Las Vegas with his card stuck to their foreheads.  The defendant falsely claimed he

_____

[10]   The sentencing guidelines provide another upward departure rationale based on the facts set forth in this section.  See Guidelines Manual (2001), §2B1.1, Application Note 15 ("Departure Considerations").  An upward departure may be warranted if the offense "caused or risked substantial non-monetary harm").  Id. (citing as an example of such harm, "theft of personal information, such as medical, educational or financial records").

was a current FBI agent in a letter to the court in Texas so that Elgindy, in the midst of committing additional crimes with the defendant, could terminate his supervised release on his Texas conviction early.   The defendant compounded his crimes by attempting to influence the testimony of a law enforcement colleague who had come together with the defendant during the tragic loss of a mutual friend and fellow officer.

Perhaps most significantly, the defendant tapped into the FBI computer to find information about an extremely serious and sensitive investigation and passed on at least some of what he learned to Cleveland and Elgindy.

In sum, the defendant was willingly converted by the promise of money from an agent of the FBI into an agent of the Elgindy Enterprise.   The true nature of the criminal conduct here would justify a sentence above the guidelines, either as an upward departure under Section 5K2.7 or as a variance under T. 18, U.S.C., § 3553(a).   See also Guidelines Manual (2001), § 2C1.1 (Bribing Public Officials), Application Note 5 ("where the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process or office that may cause loss of public confidence in government, an upward departure may be warranted" under § 5K2.7).

2.   Perjury and Witness Tampering

The application of the guidelines to this case produces no guidelines enhancement for either the defendant's witness

21

tampering or his perjured trial testimony, the former because the guidelines produce an offense level too low to add grouping-related offense levels and the latter because the obstruction of justice enhancement already applies.

As to the witness tampering, however, the guidelines do provide that a sentence in the upper end of the guidelines range or an upward departure may be warranted where grouping produces a result such that a particular group of offenses is excluded from the ultimate calculation.  See Guidelines Manual (2001), §3D1.4 ("Background") (where one group of crimes produces a substantially higher guidelines range than another, "the court will have latitude to impose added punishment by sentencing the defendant toward the upper end of the range" or by a "departure from the guidelines").

As to the perjured testimony, it would clearly support an obstruction of justice enhancement.[11]  See Guidelines Manual (2001), §3C1.1, Application Note 2 ("In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a wishful attempt to obstruct justice.").  Here, the defendant's perjured testimony resulted

---

[11]    See supra, fn. 8 and accompanying text.

from no confusion, mistake or faulty memory.  It was an obvious and willful attempt to recast facts to create a wholly false image of his conduct.

This additional conduct, otherwise excluded in the defendant's guidelines calculation, justifies either a sentence at the high end of the applicable guidelines range or an upward departure.

### 3.  Susceptibility to Abuse in Prison

The defendant cites as a reason for leniency the "likelihood" that, due to his status as a former FBI agent, the Bureau of Prisons will have to take special care in protecting him.  (Def. Sentencing Ltr., p.4).  As this Court noted in the Wingate sentencing proceeding, it is on its face unjust to give a corrupt law enforcement agent special treatment.  See also Koon v. United States, 518 U.S. 81, 116 (1996) (Souter, J., concurring in part, dissenting in part) ("To allow a departure on this basis is to reason, in effect, that the more serious the crime, and the more widespread its consequent publicity and condemnation, the less one should be punished; the more egregious the act, the less culpable the offender.").  Moreover, the cases in which such treatment has been afforded generally have involved notorious crimes in which police officers have physically brutalized their victims.  In particular, in the Rodney King and Abner Louima cases, the defendants were granted modest departures based, in

23

part, on their susceptibility to abuse in prison.  See Koon, 518 U.S. at 112 (citing "widespread publicity and emotional outrage" in upholding a 3-level departure based, in part, on susceptibility and abuse); United States v. Volpe, 78 F.Supp.2d 76, 89 (E.D.N.Y. 1999) (publicity attendant with Abner Louima case "coupled with the defendant's status as a police officer are sufficient to support" a 2-level departure).

Here, however, the defendant was involved in securities fraud and related crimes and, while his case has received some publicity, he is hardly notorious.  He has offered no evidence that he will be abused in prison, and offered only the fact that he was placed in a Special Housing Unit for a limited period while on pre-trial detention to suggest that his treatment conditions will be harsher than those faced by other prisoner. (Def. Sentencing Ltr., p.4, fn. 2).  Certainly not all police officers who commit crimes should be afforded special treatment. The defendant has simply offered no evidence that his situation is sufficiently similar to the highly unusual Rodney King or Abner Louima cases such that he should be afforded even a modest departure on the grounds of susceptibility to abuse in prison.

### III.   CERTAIN OTHER 3553(a) FACTORS

### A.   Section 3553(a)(2)(A) – Seriousness of the Offense

This case involved a massive criminal enterprise dedicated to misappropriating information from the FBI, trading

24

on that information, using it to manipulate stock prices and disseminating it to hundreds of investors who could further use it for their unjust advantage.  The defendant not only participated as a necessary part of this enterprise, he breached his sworn oath as an FBI agent in doing so.  Moreover, he provided law enforcement information about a sensitive investigation involving 9/11 to Cleveland and Elgindy, in itself an extraordinary act of betrayal.  Finally, he tampered with a witness, lied to law enforcement officials and lied on the stand at trial.  Even his own adjective - egregious (Def. Sentencing Ltr., p. 5) - is insufficient to describe the seriousness of this defendant's conduct.

B.   Section 3553(a)(2)(B) - Deterrence

     Sentencing this defendant to a significant period of incarceration will, hopefully, serve as a deterrent to those individuals who would breach their sworn duty to the public in favor of the promise of financial reward.

C.   Section 3553(a)(6) - Avoiding Sentencing Disparity

          1.   Jonathan Daws

     The defendant argues that, because Jonathan Daws's sentence was based on profits Daws earned in just two stocks, the defendant should not be held liable for the trading profits earned by his co-conspirators.  The full text of Section 3553(a)(6) reads: a sentencing court shall consider "the need to

25

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." First, this is just one of many factors that this Court must consider.  Second, Daws's role in this offense was far more circumscribed than was the defendant's.  While Daws played an active role in soliciting confidential information with respect to two stocks, the defendant procured, or induced the procurement, of all the confidential law enforcement information at issue in this case.

    2.   <u>Disparity in Amount of Loss Tables</u>

As the defendant references, the Second Circuit has recently reiterated that sentencing courts are not free to rewrite guidelines with which they disagree.  <u>See</u> <u>United States v. Castillo</u>, 2006 WL 2374281, *15 (2nd Cir., Aug. 16, 2006). While recognizing this principle, the defendant nonetheless argues that the loss table for financial crimes produces unjust results because those who commit crimes involving vast sums of money do no receive exponentially larger sentences than those who commit crimes involving smaller sums.  (Def. Sentencing Ltr., p. 3).

To the extent that this argument suggests that those who commit crimes involving vast sums such as the $350,000,000 referenced by the defendant should be punished more harshly than is provided by the guidelines, it is difficult to see how such an

argument benefits the defendant.  Moreover, as the defendant
suggests, the guidelines provide that a sentencing court may, in
limited circumstances, deviate from the guidelines if they
"substantially overstate the seriousness of the offense."  <u>See</u>
Guidelines Manual (2001), §2B1.1, Application Note 15 ("Downward
Departure Consideration").  Finally, the intuitive propriety of
the relative sentences in monetary cases is well-illustrated by
the defendant's own example.  (Def. Sentencing Ltr., p. 3).
While it is intuitively reasonable to sentence someone who has
stolen $250,000 to 27 months imprisonment, it is certainly not
intuitively reasonable to sentence someone who has stolen
$350,000,000, or 1,400 times as much, to 37,800 months
imprisonment.

Putting aside abstruse logic, the bottom line in this
case is that the guidelines, if anything, understate the
seriousness of the defendant's crime.

27

<u>CONCLUSION</u>

The defendant engaged in a long-term criminal enterprise in which he routinely breached his sworn oath to the FBI to serve Elgindy and his greed.  The government believes that this Court should therefore impose a very significant sentence consistent with the nature and extent of this defendant's crimes.

Respectfully submitted,
ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York


JOHN A. NATHANSON
Assistant United States Attorney
(Of Counsel)